PENNSYLVANIA STEEL CO. et al. v. NEW YORK CITY RY. CO. et al.
and three other causes.

In re SECOND AVE. R. CO. et al.

Nos. 2—9, 2—33, 2—149, and 3—37.

(District Court, S. D. of New York.  September 26, 1913.)

1. STREET RAILROADS (§ 49*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

A lease of a street railroad required the lessee to do certain reconstruction work, the cost of which was to be repaid by the lessor, which had the option to pay in its bonds, issued under an existing mortgage, at their face value. In some cases payment was so made, and the lessee, after writing its guaranty on the bonds, sold them at a premium. *Held*, that it could not be required to account to the lessor for the amount of such premiums.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

2. STREET RAILROADS (§ 49*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

On an accounting between the parties, the lessee was entitled to interest on the sums advanced by it during the period of reconstruction.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

3. STREET RAILROADS (§ 49*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

Where a lease of a street railroad provided that the lessee should receive certain cash in the treasury of the lessor, but in case of termination of the lease for its default the money should be considered as a loan and returned with the other property of the lessor, such money must be considered on a termination of the lease as a part of the property leased, compensation for the use of which was covered by the rent reserved, and the lessee is not chargeable with interest thereon.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

4. STREET RAILROADS (§ 49*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

By a lease of a street railroad the lessee assumed and agreed to pay all debts and liabilities of the lessor not incurred to the lessee. By a further provision the lessee was authorized, if it should deem it expedient, to change the motive power in use, and for the amount so expended it was to receive bonds of the lessor to be secured by a subordinate mortgage. Prior to the insolvency of the lessee and the termination of the lease, it had changed the motive power of certain parts of the leased lines, but had not demanded or received the bonds to which it was entitled therefor. *Held*, that such indebtedness of the lessor was not included in that assumed by the lessee, and that on an accounting between the parties it was entitled to credit for the amount so expended.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

5. STREET RAILROADS (§ 49*)—LEASE—INSOLVENCY OF LESSEE—ACCOUNTING BETWEEN PARTIES.

Various items of debit and credit considered on an accounting between lessor and lessee of a street railroad on the termination of the lease through the insolvency of the lessee.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 125, 126; Dec. Dig. § 49.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

This cause comes here upon exceptions to report of special master. See, also, 208 Fed. 747, 777.

The following are the opinions of the special master:

Since the memorandum was written in this proceeding, the Guaranty Trust Company has filed its petition for a reopening of the case, asking that either the Metropolitan receiver or it be given an opportunity to show more definitely the amount of construction expenditures on the Second Avenue line after July 1, 1902. As the petition in substance withdrew the demand that the Metropolitan estate account for $50,187.83 proceeds of the bonds in question based on the tables of debits and credits set forth in the memorandum, the prayer of the petition was granted because the final settlement of December 31, 1906, acted on at the meeting of the Second Avenue directors, on its face purported to cover a period from July 1, 1902, to that date, and this overlapped the next prior statement of August 31, 1904, an account of receipts from bonds and expenditures for construction to that time. The receiver, accepting the burden imposed on it, introduced the testimony of his auditor based on a comparison of the statements referred to with the reports of the Second Avenue Company to the Railroad Commissioners and such of the Metropolitan books as were in his possession. Without going into the details, the result, in my judgment, was such as to establish a substantial accord between the final statement of account of December 31, 1906, on which the Second Avenue directors acted at the meeting of June 27, 1907, and said reports and books.

Counsel for claimants states that he does not claim that the 590 bonds referred to in the memorandum and the item of $704,600 should both be charged to the Metropolitan Company, but makes objections to the credit of $750,000 for the power house contract and to certain adjustments of accrued interest on bonds, which latter are in addition to objections already disposed of, but renewed, relating to interest on construction advances and to proceeds of bonds which will not be again considered. Respecting adjustments relieving the Metropolitan from charges of interest accrued on bonds, in addition to their proceeds, it may be stated that, apart from the fact that such adjustments were accepted by the Second Avenue directors, so that the account became stated, there is nothing on the face of the transaction to suggest unfairness to the Second Avenue Company. By the terms of the lease the Metropolitan was itself bound to pay this accrued interest as rent, so that it does not appear that there was any unfairness in cancelling any credit erroneously given to the Second Avenue Company; accrued interest not ordinarily being regarded as proceeds of bond sales.

The other matter relating to the power house rights has not been passed on, and since the credit claimed by the Metropolitan enters into the account of December 31, 1906, it becomes necessary to consider it. The receiver has introduced evidence showing the approximate value of the Metropolitan power house and apparatus as of January 1, 1908, to be $4,095,349, and of its various substations $1,823,595, and that the cost of reproducing as of March 8, 1900, a power house properly equipped with the necessary apparatus and with the connecting substations required for the Second Avenue lines, would be $1,152,500. It is also shown that the Second Avenue mileage in the spring of 1908 was 11 per cent. of the total Metropolitan mileage; the Third Avenue system having been separated. The power house contract was among the contracts ratified at the stockholders' meeting of April 2, 1900. It seems to me, as I intimated in the previous memorandum, that the circumstances at the time this contract was made are such as to make it extremely difficult for the court to stamp the transaction as on its face fraudulent. If the contract was unusual, it cannot be regarded as unfair in its inception and would doubtless have proved of distinct advantage to the Second Avenue Company if the Metropolitan had remained a strong and solvent company. Let the accounts as to the proceeds of these bonds be stated in accordance with the statements on which the action of the Second Avenue directors was based as contained in the record.

Proposed reports in accordance with memoranda may be presented on Monday, June 30, 1913, 2 p. m.

On the 20th day of January, 1898, the Second Avenue Railroad Company made a mortgage of all its properties then owned or thereafter to be acquired to secure a proposed issue of $7,000,000 of its bonds to the Guaranty Trust Company. On the 28th day of January, 1898, it leased all these properties, subject to the mortgage, which the lessee assumed and agreed to pay to the Metropolitan Street Railway Company. On the 14th of February, 1902, the Metropolitan Company leased its properties, in which were included its interest in the lease from the Second Avenue Company, by a lease which went into effect on April 1, 1902, to the New York City Railway Company. On the 24th of September, 1907, the City Company was insolvent, and this court appointed receivers of its properties, and thereafter appointed a special master, with whom it directed that claims against the estate of said City Company should be filed on or before December 10, 1907. On October 1, 1907, the Metropolitan Company was insolvent and the court appointed receivers of its estate and directed that claims against such estate be filed on or before January 15, 1908. On September 18, 1908, an action was begun by the Guaranty Trust Company in the Supreme Court of New York to foreclose the Second Avenue Company's mortgage of January 28, 1898, above referred to, and on January 19, 1908, that court appointed its receiver of the mortgaged properties. On July 23, 1908, this court directed the surrender to its Metropolitan receivers by the City receivers of the properties of the Metropolitan Company covered by the lease to the City Company, and on October 9, 1908, instructed its Metropolitan receivers not to adopt the lease from the Second Avenue Company and to deliver its properties to the receiver appointed by the state court at midnight between November 12 and 13, 1908. On February 21, 1910, this court made its order directing the filing with the special master of claims by the Second Avenue Company, the Guaranty Trust Company, and the receiver of the property mortgaged by the Second Avenue Company against the Metropolitan estate on or before March 1, 1910, and of those by the same claimants against the City estate on or before said date. On February 28, 1910, claims against each estate were duly filed with the master by said claimants, and on January 3, 1913, the court made further orders directing that the claims so filed should be deemed to have been filed nunc pro tunc as of the dates originally fixed for the filing of claims against each estate, i. e., that the claims against the Metropolitan estate should be deemed to have been filed as of January 15, 1908, and the claims against the City estate as of December 10, 1907.

The claims filed against the Metropolitan estate are for damages for breaches by the Metropolitan Company of its covenants contained in the Second Avenue lease to it. The claims of the Second Avenue Company are, of course, primary, and those of its receiver and of the Trust Company derivative, and the breaches alleged are the bases of the claims of each. The claim as filed against the City estate by the same claimants set forth the same breaches with one exception, of the same covenants contained in the same lease, the liability of the City Company being based on the assertion contained in the claim as filed, that on February 14, 1902, the lease was assigned to it and that it accepted the assignment and agreed to perform the covenants. The exception referred to is an item of $41,000 of cash alleged to have been turned over by the Second Avenue Company to the Metropolitan Company on the making of the lease, which it is claimed the latter company promised to return on its termination.

It will be convenient to pass first upon the items of damages in the order in which they are set out in the claim filed against the Metropolitan estate, reserving the consideration of the items of claim against the City estate, which suggest different legal contentions, for consideration after the suggestions respecting such items to be made to the court have been indicated. Such items in the claim as filed aggregated $10,953,746.39, exclusive of a sum representing a balance of proceeds suspected, but not known, of the bonds above mentioned, asserted to have been unaccounted for. This

aggregate has been reduced under the decisions of the court and of the Circuit Court of Appeals in these proceedings, so that the aggregate amount of all items now claimed by counsel, in the brief is $2,015,634.12.

It will be necessary therefore to consider only the evidence and the contentions it suggests respecting items going to make up this latter sum.

1. Failure to keep track, roadbed, and special work in good working order, condition, and repair, $502,665.48.

The language of the covenants, the breach of which resulted in damage to the amount now asserted, is that the Metropolitan Company "at all times during the continuance of this lease will maintain, manage, use and operate and keep in good working order, condition and repair, at its own expense, the entire line of the said demised railroad or railroads and all extensions and branches thereof which are now or hereafter may be constructed, and all fixtures and appurtenances thereof which now are or hereafter may be constructed," and that "it will replace any part of the demised property which may be destroyed by fire or other cause and will at the termination of this lease or whenever the same ceases to be operative surrender the franchises, rights and privileges aforesaid unimpaired by any act or default."

It is conceded that the evidence establishes a breach of the obligation created by these covenants resulting in damage to a substantial amount. The claimants, in support of their demand in the claim as filed of $730,000, introduced expert evidence of a cost of reproduction in the neighborhood of this latter figure, but abandon it as exceeding the requirement of a promise to keep in good working order, condition, and repair, and accept with modifications the estimates of the respondent's expert of putting the track, roadbed, and special work in such condition as of November, 1908. The respondent urges that the sum of $120,181.83, being the sum testified to by the claimant receiver's auditor on respondent's cross-examination, as the amount expended by such receiver for this purpose up to January 11, 1911, after two years of occupancy under the supervision of a vigilant Public Service Commission, should be accepted as the cost of putting the road into the stipulated condition. I think, however, that this contention is foreclosed by the respondent's offer of testimony of a higher figure as the cost complying with the covenant, and, even if it were not, I should have no hesitation in accepting the claimant receiver's testimony that the repairs that he made were "emergency" repairs. I have no hesitation in accepting as satisfactory and fair the estimates of damage of the respondent's witness based as it is upon a long and intimate knowledge of the whole Metropolitan system, including the Second Avenue road; but his testimony of the cost of renewing the special work should be accepted without any deduction of one-half of the cost to be contributed by other lines and should be modified to meet the actual cost of the seven items of special work actually done by the claimant receiver out of the fourteen estimated on. This results in the addition of $3,756.83 to his original estimate on special work of $48,200.

The items making up the amount to be suggested to the court as damages for breach of the covenant cited will stand thus:

Cost of renewing track........................................... $373,060 00
Cost of renewing special work.................................... 51,956 83
Cost of renewing electrical parts (undisputed)................... 50,358 19

Total damage............................................. $475,375 02

2. Failure to keep rolling stock in proper condition and supplied with adequate motors.

The claim as filed fixed these damages at $687,500. The covenants, the breach of which resulted in the reduced damages now claimed, are in substance as follows:

The Metropolitan Company covenants that it "at all times during the continuance of this lease will keep the personalty hereby demised in good working order, condition and repair *so that the traffic and business of said railroad shall be encouraged and developed and reasonable accommodation given*

*to the public;* * * * that it will at the termination of this lease, or when for any cause it may cease to be operative, transfer, deliver and return to the party of the first part, in good condition, the horses, harness, cars, tools, implements, machinery, equipments, stable equipments, office furniture and fixtures, and all property of every kind leased to and used (by it) in the maintenance and operation of the railroad or railroads aforesaid, except that which is absolutely transferred, or has passed from existence by death or destruction, and shall also deliver the substitutes, increments and additions provided or made by it; and substitutes for the property impossible to deliver by reason of death or destruction, shall be equal in value to that for which they are substituted." It further agreed "that after said railroad shall be reconstructed and the motive power changed, and the cars, rolling stock, equipment and motive power supplied thereto, as hereinbefore provided, it will cause all renewals of such rolling stock, equipment and motive power to be made at its own expense, and keep the same renewed and the said railroads supplied therewith."

At the end of the Metropolitan receivers' period of occupancy at midnight of November 12, 1908, the Metropolitan receivers turned over to the claimant receiver 150 standard type closed cars, 25 converted combination cars and 100 open cars, and, when turned over, these cars were equipped with "1,000 G. E." motors, two for each of these 275 cars. The term "1,000 G. E." is the trade designation of a motor of a certain type and horse power manufactured by the General Electric Company. These 1,000 G. E. motors had originally been bought for the Second Avenue Company before the Metropolitan receivers were appointed, but had been replaced by the Metropolitan Company by a superior type of motor, of greater horse power, and adequate to the traffic requirements on the Second Avenue line. These were known as "57 G. E." motors. These latter motors the Metropolitan receivers removed from the 275 cars just before delivering them to the claimant receiver and substituted what they assert were the motors originally purchased for the Second Avenue line, being the 1,000 G. E. motors, which they insist as matter of law were all that the claimants were entitled to. It is a fact established by this record, if not conceded, that these motors were inadequate to the service, and it is also a fact not only established, but I think conceded, that they were badly out of repair and that the cost of putting them into the operating condition required by the covenant would be $78.25 for each pair of the 550 motors or $21,518.75, whether used on the cars turned over or on cars for which they were adapted. The claimants, however, insist, in this proceeding that they are entitled to the value of 550 of the "57 G. E." motors, reduced by a disputed value of the 1,000 G. E. motors actually surrendered and such value thus reduced they claim on the evidence to be $1,250 for each of the 275 cars or $343,750. This sum is included in the $541,870 claimed for the breach of the above covenants, and the balance of $198,120 is the amount claimed as required for the rehabilitation of the cars, exclusive of these motors.

A claim, however, by the claimant receiver is pending and not yet sub judice before the special master that these 57 G. E. motors were "increments and additions" within the meaning of the covenants summarized, which the receivers were bound to surrender, and that as they removed and kept them, and as they cannot now be identified, the Second Avenue receiver is entitled to recover their value as for specific property, a manifestly more valuable right than a right to damage against an insolvent corporation. Claimants concede that their success in that proceeding means that the present claim for failure to furnish adequate motors must abate, but they insist that the claims are not inconsistent, since the obligation of the Metropolitan was to keep the personalty in such a condition of repair "that the traffic and business of the railroad should be encouraged and developed and reasonable accommodation given to the public" which the 1,000 G. E. motors wholly failed to do; and that they are therefore entitled to have the damage for failure to observe the obligation thus incurred assessed in this proceeding. subject, I assume, to a recommendation to the court that the allowance shall become effective only in the event that claimant receiver shall

fail in the so-called motor proceeding. The respondent insists that the mere pendency of the other proceeding bars a determination of the damages for a failure to furnish adequate motor service. With this latter contention I do not agree, but I do think that none of the issues of fact or law in that proceeding should be determined at this time in this proceeding. That proceeding, not yet submitted, has been pending for a long time, a vast amount of evidence has been there introduced, and there are there involved many issues of fact and law which include the very issue of adequate motor service here involved, the determination of which is now asked. The claimants should not at this time be either prejudiced or advantaged in that proceeding by a determination of this question now, and I shall report to the court that an assessment of damages for failure to furnish adequate motor service should not be made unless and until the claimants fail to establish their claim in the "motor" proceeding.

This leaves for assessment the amount of damages for failure to keep the 275 cars in repair, outside of the question of the failure to equip them with adequate motors, and this damage, as has been said, the claimants now fix at $198,120. In this latter amount is included an item of $18,240 for rehabilitating, as of November 12, 1908, 96 of the open cars at $190 each and 4 remaining open cars at $750 each, or $3,000. With reference to these 96 open cars, I find on the testimony of the claimant receiver and that of the respondent's superintendent of rolling stock that they were thoroughly rehabilitated in the summer of 1908, and that the condition of these cars on November 13, 1908, fully complied with the obligation to keep in good operating condition and repair. With reference to the four remaining open cars, there is a doubt suggested by the claimant's receiver's testimony that four had no platforms when he received them. This statement was connected with statements clearly referring to the condition of the closed cars, and I think that claimants' counsel has mistakenly attributed that condition to these four open cars as the basis of the claim of $750 for each car. I find and shall report that $50 for each of these four cars was required to put them in fair operating condition.

The balance claimed as damages for the breach of the covenant respecting the 150 closed and 25 combination cars is $176,880, made up as follows:

| | |
|---|---:|
| 3 closed cars at $1,500 | $ 4,500 |
| 147 closed cars at $1,040 | 152,880 |
| 25 converted combination cars | 19,500 |
| | $176,880 |

The testimony of the claimant receiver shows that the condition of the three closed cars was such that $4,500 was needed to make them usable. I do not understand that the item is disputed. The cost of rehabilitating the 147 closed cars at $1,040 is vigorously disputed; the respondents contending that the cost per car is $447.37, or $65,763.39 for all. The latter figure is based on the testimony of the respondents' superintendent of rolling stock, who had a personal, though of course general, knowledge of the condition of the rolling stock of the system on the date in question, including that of these surrendered cars and an intimate knowledge of the cost of repairs. It meets the testimony of an expert without that knowledge, who speaks from what he saw and heard six months later and whose conclusions based on such data suggest what is really a cost of reconstruction much in excess of the requirement of the covenant and very near to that of a brand new car. I have no hesitation in accepting this lesser figure as more satisfactory.

With reference to the 25 combination cars, the claimant receiver testifies that they were in bad condition when he received them. The respondents' expert testifies that they were in good condition at that time, having been rehabilitated in the spring of 1907, which it will be noted is the year prior to the rehabilitation of the open cars. I accept the statement of the receiver as to the condition of these cars, and, although it was apparently

somewhat better than that of the closed cars, I adopt the same figure of $447.87 per car as the cost of rehabilitating them, or $11,196.75 in all.
This item of damage will stand thus:

Rehabilitation of platform of four open cars.....................$   200 00
Rehabilitation of three closed cars.............................   4,500 00
Rehabilitation of 147 closed cars..............................  65,763 69
Rehabilitation of 25 combination cars..........................  11,184 25

Total ............................................$81,647 94

To this amount should be added the undisputed item of $21,518.75 for the rehabilitation of the 1,000 G. E. motors in the event that it shall hereafter be decided that those were the only motors that the claimants were entitled to, and this would make a total damage for the breach alleged of $103,166.69.

3. Failure to pay taxes and assessments, $446,826.46.

In the claims as originally filed the amount claimed for unpaid taxes and assessments was $748,876.39, but as a result of the decisions of the Circuit Court of Appeals in these proceedings claimants now ask the allowance of the reduced amount stated. It is made up as follows:

(a) Taxes and assessments imposed before the lease of January 28, 1898, to the Metropolitan was made:

Assessment for paving First avenue confirmed February 17, 1883.. $22,143 85
Assessment for paving 96th street..............................   4,946 28
Assessment for paving First avenue between 92nd and 109th streets    719 65
Real estate tax 1862...........................................       3 26
Real estate tax 1866...........................................       2 00

$27,815 04

On this interest is claimed up to October 1, 1907, aggregating $32,040.08, making the total $59,855.12.

(b) Franchise taxes from 1901 to 1907, inclusive, and interest to October 1, 1907, as follows:

1901 .............................$62,107 23    $26,011 44    $ 88,118 67
1902 .............................. 56,031 00     19,459 54      75,590 54
1903 .............................. 46,590 06     13,012 27      59,602 33
1904 .............................. 46,661 12      9,787 81      56,448 93
1905 .............................. 41,221 29      5,767 85      46,989 14
1906 .............................. 35,370 52      1,490 18      37,860 70
1907 .............................. 22,361 03                    22,361 03

$386,971 34

(a) The claimants ask the allowance of the taxes and assessments which were unpaid at the making of the lease, urging that, as matter of law, they must be held to be among the "debts or liabilities" which the Metropolitan agreed to assume. The respondent urges that prima facie these words do not cover taxes. There are, however, other words in the lease which do, as the Metropolitan expressly covenanted to save the Second Avenue Company harmless and indemnify against "any unpaid judgments, costs, assessments, license fees, taxes, orders of court."

The taxes and assessments with the interest claimed, the latter subject to verification, are allowed.

(b) As to the franchise taxes, the contention is made that as the covenant was made in 1898 prior to the enactment of the statute taxing franchises for the first time and bringing within the range of the state tax system "a new character of property," such taxes are not within its purview. The language is that the Metropolitan "will pay all taxes, assessments and charges which may lawfully be imposed in respect of the demised property or any part thereof." Considering the contention, without reference to the numerous authorities cited in the many briefs submitted respecting it, it would seem that a tax on the franchises, constituting as they did the most

important part of the demised property levied in pursuance of a constitutional statute, is a tax "lawfully imposed" within the meaning of the covenant. It is not, however, necessary to ask the court's consideration of the thorough discussion of the matter contained in the briefs, as I think it has been disposed of in the Central Crosstown Case. In that case the City receiver squarely raised the point under a covenant contained in the lease made in 1890 by the Christopher and Tenth Street to the Crosstown Company, which was assumed by the Metropolitan and City Companies, the language of which was that the lessee would pay "all taxes, assessments and charges which * * * may be lawfully imposed on the party of the first part." The Appellate Court, while not discussing the matter in its opinion, allowed the franchise taxes imposed on the Crosstown properties down to October 1, 1907. The language of the two covenants is not to be distinguished and that ruling is controlling here.

The item to be allowed against the Metropolitan estate for taxes is therefore as follows:

(a) Real estate taxes, assessments, and interest.................. $ 59,855 12
(b) Franchise taxes and interest............................ 386,971 34
                                                           _____
    Total ............................................... $446,826 46

(4) Failure to pay rent and taxes during occupation by receivers for experimental occupation, $122,911.

As originally filed, this item was for six installments of rent of $41,895 each or $251,370 accruing after the receivership up to December 1, 1909. Under the decisions of the Appellate Court it has been reduced to the amount stated, and as so reduced includes certain taxes accruing during the period of occupancy and payable as part of the rent which were not originally demanded. As thus reduced and constituted, it presents no contentions; its allowance being conceded. It is, however, as the respondent justly points out, subject to reduction by any allowance that may be made of net profits, if any, earned by the Metropolitan receivers during their period of occupancy to which the claimant may become entitled in the so-called use and occupation proceeding brought by him, still pending, and a reservation for that contingency will be made in the report.

(5) Failure to restore the car house, $105,958.52.

The amount demanded for this item in the claim as filed was $175,000. It depends on the following facts: In the Second Avenue lease, the Metropolitan covenanted to "replace any part of the demised property which may be destroyed by fire or other causes and at the termination of the lease, or whenever the same ceases to be operative to surrender the franchises, rights and privileges unimpaired by any act or default." On January 15, 1908, the time for the filing of claims as fixed by the court against the Metropolitan estate expired, and this claim, by the orders before referred to, is to be deemed filed as of that date. In February, 1908, the Second Avenue car barn on the westerly half of the block bounded by First and Second avenues and Ninety-Sixth and Seventh streets covered by the lease was destroyed by fire. The loss was $309,258, and the insurance collected $203,299.48; the difference being the balance now claimed.

It is clear that on the day which determines the provable status of claims there was no cause of action in existence for damages for this loss. In the "Termination of Lease" proceeding, the Appellate Court as a corollary to the right to net profits clearly lays down and applies the principle that losses accruing during the period of occupancy must be borne by the lessor. As against creditors existing at the time, this demand has not even as strong an equity to support it as a demand contingent at the date determining provable status which ripens into a fixed liability before distribution, and yet under the decisions such a demand may not be allowed. I regard the reasoning not only in the case referred to, but in the Metropolitan Express and Central Crosstown cases as well, as conclusive against the allowance of this demand for damages, and shall therefore recommend that it be disallowed.

(6) Failure to account for proceeds of First Consolidated mortgage bonds, $50,187.83.

The bonds here referred to are $5,040,000 of the $7,000,000 of bonds above referred to, which were secured by the mortgage in process of foreclosure by the claimant trustee in the action in the state court in which the claimant receiver was appointed. The balance of $1,960,000 secured by bonds numbered from 5,041 to 7,000, inclusive, were to be used to retire certain General Consolidated bonds issued in 1885 amounting to $1,600,000, and an issue of $300,000 of debenture bonds issued in 1889, and to pay off a mortgage on real estate made in 1888, amounting to $60,000. Of the total of 7,000 of bonds, 5,682 were actually issued according to the record, 642 for purposes connected with the retirement of part of this prior indebtedness, as the record affirmatively shows. The balance, consisting of the bonds numbered from 1 to 5,040, inclusive, for $1,000 each, suggest the contentions to be decided, and their issue or use were controlled by certain provisions of mortgage and lease as the basis of such contentions which may be briefly summarized.

The lease made January 28, 1898, eight days after the mortgage, reciting that the lessor had obtained authority to change its motor power from horse to electric and had entered into contracts for the reconstruction of its roadbed required by the change and was then largely indebted to the Metropolitan lessee for advances for such construction and had mortgaged its property to secure 7,000,000 of its bonds for the purpose of paying prior indebtedness, and that incurred in such reconstruction and electric operation and of carrying out contracts respecting the latter purpose, which bonds were not then issued, states that the Second Avenue Company will, *"in accordance with the terms and conditions of said mortgage,* issue and dispose of its said bonds to an amount sufficient to pay and discharge all its debts and obligations and contracts heretofore incurred in the reconstruction of its road and roadbed made necessary by the change in its motive power and will from the proceeds of such bonds pay and discharge all such debts, obligations and contracts including the debt now due or hereafter (thereafter) to grow due for such purposes to said party of the second part" (Metropolitan Company); that it would thereafter "at the demand and upon the request of the Metropolitan Company issue and dispose of or cause to be issued and disposed of by the trustee named in said mortgage and the proceeds paid over to it, sufficient of its bonds to supply suitable cars, rolling stock, equipment and motive power to its said railroad to enable it to operate the railroad hereby leased and demised by the underground system of electricity or any other motive power, and to repay any expenditures made by it in improving the leased property, or in erecting, changing or reconstructing any building or buildings thereon, and whenever it shall desire to change the motive power upon parts or portions of said railroad upon which changes have not heretofore (theretofore) been authorized or proposed that it (would) issue and dispose of any pay over the proceeds thereof to the (Metropolitan), or deliver to it or cause the trustee named in said mortgage to sell and dispose of any pay over the proceeds thereof to (it) or deliver to (it) the balance of its said bonds secured to be paid by the mortgage aforesaid or so much thereof as (was) or (would) be necessary for a change of motive power and a reconstruction of its road and roadbed made necessary thereby, and to supply the necessary cars, rolling stock, equipment, and motive power thereof to enable it to operate said road as reconstructed." Then follows a covenant to issue further bonds secured by an additional mortgage for similar purposes to be applied solely to betterments, not relevant to the matter now under examination, and a covenant of assumption of debts and liabilities except those incurred to the Metropolitan Company, but including all bonds issued under this mortgage to the claimant trust company when issued and disposed of under said mortgage and lease.

The mortgage, the provisions of which are thus made part of the lease, after reciting the underlying indebtedness, directs that bonds numbered 5,041 to 7,000, inclusive, be reserved exclusively for refunding this indebtedness. It also recites the grant of the right to change to electrical power by the

Railroad Commission in 1897, and it is a matter of inference from the evidence contained in the record that this grant did not include the First Avenue line from Fifty-Seventh street to the Harlem as that apparently was obtained in 1907. It is therefore to be assumed that the bonds numbered 1 to 5,040, inclusive, were to be used in effecting the reconstruction and change on the other lines of the lessor company, and the evidence shows that they were so used. By the terms of the mortgage these latter bonds so numbered were to be certified by the trustee and delivered to the Second Avenue Company, or to any person designated by it, only upon its written application expressed through a resolution of its board of directors stating what amount of bonds were required at the time. The evidence shows that this provision was complied with; the resolutions of the board of directors of the Second Avenue Company, with the statements to which they refer, being contained in the record. These statements, which with one other that the respondent introduced, constitute the basis of a reconstructed account of the proceeds of bonds and expenditures of the Metropolitan for reconstruction, upon which the claimants base their demand under this head. This account is set forth in the brief, and as it represents the result of the contentions of claimants and their final demand it is here reproduced for purposes of examination and comment.

Statement of Account of Metropolitan Company in Respect to Proceeds of First Consolidated Mortgage Bonds.

| | | | |
|---|---|---|---|
| 1898. Mch. 22 Sale of bonds (S. M. 472) | 1,914,166 67 | Advanced by Met. St. R. Co. on account of loans, Second Avenue R. Co. to | |
| 1898. May 16 Sale of bonds (S. M. 218) | 635,750 00 | take up their outstanding notes (S. M. 493).. | 224,114 75 |
| 1898. May 18 Sale of bonds (S. M. 213) | 425,889 89 | Expended for construction of roadbed, superstructure and substructure | |
| 1899. June 2 Sale of bonds (S. M. 218) | 531,000 00 | to August 31, 1904 (S. | |
| 1900. Mch. 15 Sale of bonds (S. M. 213) | 1,136,405 51 | M. 493)................ | 3,276,748 82 |
| 1904. Nov. 18 Sale of bonds (S. M. 201) | 685,785 00 | Expended for reconstruction of Second Ave. car house (S. M. 493)...... | 381,741 74 |
| 1907. June 27 Sale of bonds (S. M. 497) | 704,600 00 | Cost of car equipment (S. M. 497)............... | 703,438 01 |
| 1907. June 27 Sale of bonds property at 127th St. & Second Ave. (S. M. 497)........... | 114,412 88 | Engineering and superintendence (S. M. 497).... | 57,610 14 |
| | | Consents (S. M. 497)..... | 498 20 |
| 1907. Note (S. M. 717).... | 286,465 67 | Track & roadway (S. M. 497) ................ | 722,685 25 |
| | | Reconstruction 96th Street car house (S. M. 497).. | 159,988 35 |
| | | Rent & Yard expense, etc. (S. M. 497)......... | 126,716 32 |
| | | Electrification of First Av. line, Exhibit 33.. | 701,816 18 |
| | | Adaptation of First Ave. car house to electric cars, Exhibit 34 .................. | 39,020 03 |
| | | Balance ............ | 50,187 83 |

It may be noted that there appears on the face of this account as thus stated an arithmetical error in the addition of credits given, which reduces the balance by $10,000, making it $40,187.83. The debits and credits given have been carefully verified by a reference to the record and are correctly stated in accordance with the contentions of claimant, so that it is simply a mistake in adding which reduces the amount claimed to the figure stated.

As this account shows on its face, the Metropolitan is charged with what appears to be the proceeds of bonds and is credited with expenditures of the nature indicated. The first six debits result from the issues and sales shown by the record of all of the 5,040 bonds, with the proceeds of which alone the Metropolitan in any event is chargeable. The claimants have, however, attributed to a sale of 590 bonds in 1904, two debits, one of actual proceeds amounting to $685,875, in accordance with a contention that it was with such proceeds that the Metropolitan is chargeable, but which were never charged in any of the statements of account between the two companies contained in the record, and the other the debit of $704,600 with which the Metropolitan is charged in a statement of account submitted and adopted by the Second Avenue directors on June 27, 1907, which exceeds the actual proceeds of these bonds by $18,725. That there is here an error, and that on any theory one or the other of these debits should be eliminated from the account in any event, was clearly shown in respondent's reply brief, and I had supposed that it was an inadvertence which the claimants would correct. They nevertheless insist "that there is no basis for the assertion that any connection exists between the credit for $704,600 * * * and the 590 bonds." It is therefore left for me to say, not only that there is such a basis, but that these two debits can on the record be attributed to nothing else. The four resolutions on which statements rendered to the Second Avenue directors at the meetings of March 9, 1898, May 11, 1898, May 22, 1899 and March 9, 1900, were based, and on which the mortgage trustee by the terms of the mortgage acted in issuing the bonds call for 2,000, 1,000, 450, and 1,000 bonds, respectively, or 4,450 in all, leaving for issue 590 bonds which were called for by the resolution adopted at the meeting of November 9, 1904. These exhaust the issue of 5,040 bonds and are all that the Second Avenue could or did call for or that under the terms of the mortgage the trustees could or did issue for purposes other than the refunding of the underlying indebtedness. The statement on which the directors acted demanding the issue of these last 590 bonds at the meeting of November, 1904, charges the Metropolitan with "cash received from sale of bonds $4,533,405.51," which must of necessity be attributed, and which the claimants themselves attribute, to the 4,450 bonds of which issue was demanded at the four prior meetings and which, the uncontradicted evidence introduced by claimants show, were issued long before that date. The debit of $704,600 "proceeds of sale of Second Avenue Railroad Company Consolidated mortgage bonds" contained in the only other statement of account between the two companies disclosed in the record on which the action of the directors of the Second Avenue Company was based at this sixth meeting of June 27, 1907, cannot be attributed to any bonds other than these last 590 bonds, since as comparison of the five statements shows the four prior statements of cash from bonds are attributed not only by the terms of the resolutions based upon them, but by claimants themselves to the 4,050 prior bonds. Either the debit of $685,875 or of $704,600 must be stricken from the claimants' reconstructed account above set out and the charge against the Metropolitan changed from a debit balance of $40,187.83 to a credit balance of $645,687.17 or $664,412.12 as the case may be.

This, on claimants' own statement of the account, disposes of the claim that there are any of the proceeds of the bonds to be accounted for; but as they have credited the Metropolitan with two items relating to the electrification of the First Avenue line, aggregating $704,836.21, which the respondent claims as an offset, it will be necessary to pass on some of the contentions on which the reconstructed account is based, in order to determine whether such credits have been properly disposed of in this connection.

The first debit of $1,914,166.67 in claimants' suggested account is the same as the charge in the first statement of account between the two companies. It represents a sale of the first 2,000 bonds at an agreed price of 95 with certain interest to the date of sale. The Metropolitan actually sold these 2,000 bonds for $2,104,166.67, in excess of such price and of par. These bonds were called for, issued, and sold nearly two months after the lease, when the Metropolitan was in a control of the Second Avenue Company under

the lease as complete as at any of the dates involved subsequent thereto. The propriety of the transaction is conceded by claimants, "because the transaction was under discussion at the same time as the making of the lease and the prospect of making a profit may have been one of the inducements which led the stockholders to ratify the lease." There is no evidence that it was under discussion, nor is there anything in the record that it was suggested to the stockholders at the time; and I can see no reason why the criticisms leveled at other charges do not apply to it, if they apply to any.

The second and third debits represent the actual proceeds of two sales, one for 600 and the other for 400 bonds, aggregating $1,061,639.89. The issue of these 1,000 bonds was demanded at the meeting of May 11, 1898, on the statement adopted and approved showing expenditures by the Metropolitan of $2,919,561.67. This sum, less the above-mentioned sum of $1,914,166.67, proceeds of the first 2,000 bonds, left $1,005,395 as an amount then due for advances to liquidate which the issue of these 1,000 bonds was directed. Counsel for claimant apparently thinks that this statement shows that the Metropolitan received the proceeds of these 1,000 bonds amounting to $1,-061,639.69 in settlement of this balance. The brief states the contention respecting this transaction to be "that the Metropolitan should be charged with the whole amount obtained by the sale of the bonds and not merely with their par value." It, however, shows nothing of the kind. The difference between the proceeds of bonds charged in the next statement of $2,975,805.56 on which action at the meeting of May 1, 1899, calling for the next issue of 450 bonds was based and the charge of $1,914,166.67 in this statement is precisely $1,061,638.89, so that this is the amount with which on the face of the statements the Metropolitan is charged. This transaction is therefore, from no point of view, open to criticism.

The fourth debit of $531,000 represents the actual proceeds of the 450 bonds just mentioned. A similar comparison of the statement presented at this meeting of May 1, 1899, with that presented at the meeting of March 9, 1900, on which the demand for the issue of the next 1,000 bonds was based, shows a difference of $450,000, so that the Metropolitan was charged with the par of the bonds, or $81,000 less than their proceeds. It is the first of the debits to which claimants' criticism applies.

The fifth debit of $1,136,405.51 represents the actual proceeds of these 1,000 bonds directed to be issued at this meeting of March, 1900. Comparison of the statement acted on at this meeting with that presented at the next on November 9, 1904, at which the issue of the last 590 bonds was directed, shows that the Metropolitan was charged with $1,107,599.95, an amount much in excess of the par value of the bonds. Still, it is $28,805.56 less than the actual proceeds.

The sixth debit is $685,875, representing the actual proceeds of the last 590 of the whole issue of 5,040 bonds. The seventh debit following is the amount with which the Metropolitan is charged in the statement acted on at the meeting of June 27, 1907, and is, as has been shown, to be attributed to these same bonds. It is $704,600, or $18,725 in excess of actual proceeds.

Claimants' contention, in effect is, that the debits of proceeds of bonds as shown in the statements should be surcharged by the excess of proceeds over debits. It affects only the third and fourth issue of bonds to which the fourth and fifth debits of this suggested account relate. As to these bonds the proceeds exceed the charges by $109,805.56, but this is to be reduced by this last-mentioned $18,725 excess of charge over proceeds, leaving a total excess in the whole issue of proceeds over charges of $91,080.56.

Claimants' contention respecting this excess is that the relation between the Second Avenue Company and the Metropolitan, while nominally that of lessor and lessee, was under the lease that of trustee and cestui que trust. The control that it gave the lessee, and the fact that the latter chose the board of directors of the lessor company, which appointed the executive officers, made the relation confidential and so closely assimilates it to that indicated that the rules controlling between trustee and beneficiary, attorney and client, guardian and ward, and the like, apply, and the burden of establishing the fairness of transactions on their face showing a profit to the

Metropolitan was on it, and this it is said the latter has not met. It may be said, in passing, that the respondent has shown that, at stockholders' meetings duly called and held after the two issues of bonds under criticism, resolutions were passed ratifying all contracts, settlements of claims, and releases made during the year by the directors. It is not to be assumed, as claimants assume, that all the disclosure to which any stockholder was entitled was not made at these meetings, for presumptively every stockholder present or absent had full access to minutes of director's meetings which were ratified by those present without dissent. But apart from this consideration, I do not think that those two transactions on their face show any unfairness to the Second Avenue Company. By the lease the Second Avenue Company agreed in language I have quoted either to issue and dispose of and deliver to the Metropolitan the proceeds of the bonds for these reconstruction purposes, or to deliver the balance of the bonds themselves. Long after cash advances in excess of any credit disputed by claimants had been made, these 1,450 bonds were issued and accepted in the one case at not less than par and in the other considerably in excess in part settlement of such advances, and the transactions cannot be regarded as anything but the fulfillment of a contract made at arm's length. If subsequently the Metropolitan anticipated the payment of principal and interest by selling in excess of par, I do not perceive that that resale was not within the contemplation of the parties to the lease or not well within its language, nor that it is any more open to criticism than the charge of the first 2,000 bonds, the propriety of which claimants themselves in terms concede. The result is that there should be eliminated from the debit side of claimants' suggested account this surcharge of $91,080.36. When this is done and the sixth debit of $687,500, which is included in the seventh debit of $704,600 through claimants' failure to perceive that both items are attributable to the same 590 bonds, is disregarded, as it clearly must be, the sum of the debits chargeable to the Metropolitan on claimants' own showing, including the final and questionable debit of the Second Avenue note for $286,465.67 still unpaid, is reduced to $5,655,983.06.

The total of the first nine credits appearing in claimants' account is $5,653,541.58, or only $2,441.48 less than this total charge. These nine credits all appear in the statements of account between the two companies, being thus conceded, and with two other credits also appearing, but objected to and eliminated by the claimants, these constitute all the credits claimed by the Metropolitan and allowed to it in the accounts between the two companies. One of these two credits, amounting to $37,970.29, is for interest on advances during the period of reconstruction, and has been eliminated without the slightest justification from anything that the record contains and without the suggestion of a plausible reason in the briefs. The Metropolitan Company on the face of the statements was clearly entitled to it, and, when it is restored, it appears that the Metropolitan advanced $35,528.86 more than the largest amount with which on the evidence it was properly chargeable. This result makes it altogether unnecessary to consider the elaborate and ingenious argument of counsel based on the same legal proposition as that advanced in support of the surcharge mentioned above, intended to justify the elimination of the other credit of $750,000 claimed and allowed to the Metropolitan for the power house rights in the statement of account acted on at the meeting of November 9, 1904. It may be said, however, with reference to the contract conferring these rights, that, when it was made in 1900, the condition of the Metropolitan was such that a right to power at cost from it must at that time have borne an aspect very different from that which it bears now.

The account respecting these matters will be stated in the report in accordance with the foregoing, leaving credits for expenditures on the First Avenue line, which were not demanded or given in any of the statements of accounts between the companies respecting these bond proceeds and were incurred after the last of those statements was acted on to be disposed of in connection with the respondent's counterclaim which they suggest. The account thus stated, without including the item for power rights, as to which

208 F.—49

no opinion will be expressed to the court, will show a balance due to the Metropolitan; but as claimants assert nothing respecting such balance, standing on the accounts as disclosed by the statements which they insist constitute an account stated, no allowance by way of counterclaim or otherwise respecting it will be suggested.

(7) Failure to repay money delivered at the inception of the lease, $65,-182.74.

In this amount the principal sum included is $41,241.84, the balance being interest claimed. It is based on the following clauses of the lease:

"It is further understood and agreed that the party of the second part receives the cash in the treasury of the party of the first part at the time of the taking effect of this lease as owner, and not as lessee thereof, subject, however, to this reservation and condition, viz.: That, if the party of the first part shall resume possession of the demised property on account of any default of the party of the second part, then the said money so received by the party of the second part shall be deemed to have been a loan instead of an absolute transfer, and shall be returned by the party of the second part to the party of the first part with the remainder of the property of which the party of the first part takes possession."

The principal amount represents the cash in the construction account on the books of the Second Avenue Company. Respondent concedes that claimants have a claim against the Metropolitan estate for any money which is shown to have been received by the Metropolitan Company, at the time of the lease, but insist that there is no evidence in the record that any money *was* received. The only evidence in the record is the testimony of Mr. Brown, auditor for the Metropolitan receiver, that the construction books of the Second Avenue Company show cash on hand on January 28, 1898, of $41,241.84. The respondent insists that the mere fact that the item appeared on the books does not even permit an inference that there was that amount in the treasury, citing Smith v. Rentz, 131 N. Y. 175, 30 N. E. 54, 15 L. R. A. 138. I think, however, in view of the exceptional control vested in the Metropolitan Company by the lease and the possession enjoyed by it, coupled with the fact that no countervailing entry appears, it is possible to regard the books for such a purpose as this as those of the Metropolitan itself and the entry as an admission against interest. While the question is close, I think that, to the extent of the principal sum, the amount claimed should be allowed. Interest is not allowable, however, as the lessee did not agree to pay it by the language quoted; the right to interest, except as damages for the wrongful withholding of money, being a matter of agreement.

The disposition to be recommended to the court of all items claimed has now been indicated. The total damages are $1,168,002.39, subject to a deduction of the amount of the net profits, if any, which may be found to be due from the Metropolitan receiver in the use and occupation proceeding still pending, and to the addition of the $21,518.75 for the repair of the "1,000 G. E. motors," if it shall be held, in the "motor proceeding" likewise pending, that those were the only motors to which the Second Avenue Company under the lease was entitled. The question remaining to be passed on is whether this amount of $1,168,002.39 is to be still further reduced by the amount of respondent's counterclaim for Metropolitan advances made in 1907, prior to the receivership, for the electrification of the First Avenue line, which were $740,836.21.

I think that the claimants have in effect conceded that the respondent, if entitled to this deduction when they credited the Metropolitan with this amount in their account of the bond proceeds above set out. They nevertheless urge in their reply brief that he is not, except as against the obligation to account for such proceeds. Their reason for this must be that the payment of these bonds was assumed by the Metropolitan in the lease which they contend as a matter of law prevents the offset of advances represented by the bonds, and it is the explanation of the ingenious and elaborate effort to surcharge the debits and falsify the credits in the account between the companies as to the proceeds of these bonds above narrated. After these bonds were issued and the proceeds devoted to the reconstruction pur-

poses contemplated by the lease and the mortgage, subsequent expenditures for similar purposes were to be met by an additional issue of bonds inferior to the lien of the consolidated bonds mentioned and also of the rents reserved by the lease. These latter bonds, if issued, the Metropolitan does not in my opinion assume or agree to pay, although it is contended that it does.

The provisions of the lease respecting the issue of additional bonds is as follows:

"Whenever it shall be deemed by the party of the second part expedient to extend the line or lines of the railroad hereby demised or to require additional real estate or construct additional buildings for the operation of said railroad, *or to change the motive power upon said railroad* then upon the request of the party of the second part, the party of the first part shall authorize, execute and deliver to the party of the second part the negotiable bonds of the party of the first part in the usual form for the amounts the expenditures of which shall be required for such extension, acquisition, construction of change, and upon the report of the party of the second part, shall secure such bonds by a mortgage or mortgages upon all its property and franchises, but such bonds when issued shall be applied solely to betterments for which the same are issued."

Prior to the appointment of receivers on October 1, 1907, the 5,040 First Consolidated mortgage bonds had been issued and their proceeds expended and these additional advances for the electrification of the First Avenue line had been made by the Metropolitan. Its right to demand additional bonds for such advances secured by an inferior lien is clear under the language quoted and was on that date complete. Although a demand had not then been made, a debt was then owing, which, though not then matured by actual demand, is available to the insolvent as an offset. Matter of Hatch, 155 N. Y. 401, 50 N. E. 49, 40 L. R. A. 664. Payment of this debt contracted subsequent to the making of the lease and of the issue of the prior bonds and the expenditure of their proceeds was not assumed by the Metropolitan lessee. The language of the assumption clause refers only to debts existing at the making of the lease, except that the consolidated bonds thereafter to be issued are expressly assumed. No other future debt is. The language of the covenant is as follows:

"This lease is made subject to all debts and liabilities of the party of the first part, except debts due or liabilities incurred to the party of the second part, and such debts and liabilities as aforesaid and subject to the provisions and conditions of this lease are hereby assumed and are to be paid by the party of the second part as a part of the consideration hereof, and all bonds that shall be issued by the party of the first part under the mortgage to the Guaranty Trust Company hereinbefore referred to, when issued and disposed of as hereinbefore provided, or as provided in said mortgage or in this lease, shall be included among the obligations which the party of the second part assumes and agrees to pay under the provisions of this lease."

Even, however, if the debt did come within the assumption clause, it is clear that, under the decisions of the Appellate Court, the liability of the Metropolitan would be that of surety; the pledged property remaining the primary fund for the payment of bonds evidencing the debt, so far as it is concerned. Judge Hough clearly holds this in the Central Crosstown Case (Farmers' Loan & Trust Co. v. Central Park, N. & E. R. R. Co.) 193 Fed. 963, 113 C. C. A. 591, and I think that it is also the result of Judge Ward's reasoning in that case, though the claimants say not. However this may be, Judge Noyes, speaking for a unanimous court in the Second Avenue stockholders' appeal, clearly holds that the mortgaged property is a primary fund for the payment of the debt assumed and that the obligation of lessee to lessor created by a clause of assumption, such as that quoted, is contingent on the failure of the property to realize on foreclosure the amount assumed. This being so, the respondent's right to bonds secured by the stipulated lien for these advances cannot be avoided by the assertion of a claim contingent on the day fixed for filing claims, founded on the assumption clause. Of course, since the Second Avenue Company is insolvent as the record shows, these bonds, if issued for the purposes of the offset, are to be regarded as due.

What results is that the claimants have betterments represented by the advances and presumptively of the value of those advances, for which they will have paid if these advances be allowed as an offset. The estate represented by the claimants is not by such a disposition of the matter unjustly enriched at the expense of the creditors of the Metropolitan estate, and if, as the result of foreclosure and sale of the Second Avenue properties, it should ultimately appear that that value was less, the position of the claimants respecting this possible future demand for the difference is merely that of any holder of a contingent claim.

Therefore, while I think it clear that the Metropolitan did not under the lease assume or agree to pay the Second Avenue's debt for these advances, which makes the right to the set-off beyond question, it seems to me that, even if it had, the respondent is entitled to the deduction of $740,836.21 from the total of damages to be reported of $1,168,002.39, leaving $427,166.18 as the net amount, with the possible further addition and reduction indicated.

There remains for consideration the question whether the City estate is liable under the Metropolitan lease of February 14, 1902, to the City Company for any of the demands, the allowance of which is to be recommended to the court against the Metropolitan estate. It is obviously not liable for any not to be allowed against that estate, and it can be liable for those which are allowed only through privity of estate or privity of contract.

Claimants insist that the opinion of the Circuit Court of Appeals in the Central Crosstown case determines that the City estate is liable on either ground or both. I do not so understand that decision. After intimating a doubt as to whether the transfer of the Crosstown-Metropolitan lease to the City Company by the Metropolitan might not operate as an assignment, what the court did say (198 Fed. 760, 117 C. C. A. 542) was: "Furthermore passing from privity of estate to privity of contract, the question whether the covenants in the Metropolitan-City lease should be construed to be rent covenants which are limited to the duration of the lease, or whether they survive, it is entitled to serious consideration. *All the questions should be construed upon a complete record and when it is necessary to pass upon them.*" The court therefore did not pass upon them. It did allow, however, certain dividend rentals and a franchise tax for the year 1907, accruing before the end of the period of experimental operation which it regarded as indicated by the record in that case; but that that decision is not to be extended further is made clear by the opinion just handed down in the Matter of Hemphill and the Second Avenue Bondholders v. New York City Railway Company, 204 Fed. 513, by the same court. It is there held: First, that the assumption clause of payments therein referred to contained in Metropolitan-City lease was in its essence a rent covenant limited to the existence of the lease; and, second, that the lease terminated, as distinguished from being defaulted on, long before July 31, 1908, the court saying as to this that "indeed we think that any idea that it would be continued was given up by all parties in interest even before February (1908) when the interest included in the August coupon began to run."

This decision disposes at once of the contention of claimants that the items of waste for failure to repair roadbed and rolling stock, as well as for failure to pay money delivered to the Metropolitan at the inception of the lease, are within the assumption clause, for clearly such items are not "rent" and do not come within a promise which is in its essence a rent covenant. They cannot be allowed on the theory that there was any privity of contract between the City Company and claimants, because that is the only clause in the Metropolitan-City lease which can by any stretch of imagination be regarded as contemplating the creation of an obligation to any one, except the lessor, respecting such items. The right to allowance must, if it exist, spring from privity of estate resulting from an assignment to the City Company of its unexpired term created by the Second Avenue-Metropolitan lease. No sublessee, independent of express contract, is ever liable to the original lessor on covenants to repair or to refund, such as those in the Second Avenue lease, independent of express agreement, and I do not understand that claimants make that contention. They do insist that the City Company is to be re-

garded as an assignee, notwithstanding that the lease of the Second Avenue Company to the Metropolitan was in legal effect in perpetuity, while that to the City Company was for 999 years; but this is precisely the opposite of what counsel for the claimants conceded in the Hemphill bondholders' claim v. City Company, just reviewed by the Appellate Court, above cited. Representing there 405,760 of the outstanding $5,682,000 First Consolidated Second mortgage bonds here represented by the claimant trustee and receiver, counsel made the concession which resulted in the third conclusion of law in the report, to which no exception was filed and which was confirmed by the District Court, such conclusion being: "Third. The alleged lease from the Metropolitan Street Railway Company to the New York City Railway Company (Interurban Street Railway Company) did not operate as an assignment of the lease from the Second Avenue Railroad Company to the Metropolitan Street Railway Company." As the order confirming the report has just been affirmed, it must be regarded as settled that the City Company was a subtenant and not an assignee of the Second Avenue lease, so that there is no liability on the part of the City Company based on privity of estate for a failure to observe these Metropolitan covenants for which damages have been allowed against the Metropolitan estate.

The next item, of $122,911.10 allowed against the Metropolitan estate for failure to pay rent and taxes during the period of occupation, consists of two installments of rent, aggregating $75,411, the earlier accruing on September 1, 1908, for the quarter ending August 31, 1908, the latter being for two months and twelve days of the ensuing quarter. Two other items are the special franchise and realty tax for 1908, proportioned to November 12, 1908, when the road was surrendered to the claimant receiver aggregating $37,195.37. These items are clearly not allowable against the City Company under the recent decision in the Second Avenue Bondholders' claim against that company, for it is there said that the lease was substantially terminated long before July 31, 1908, which is before any obligation respecting them accrued against the City Company. It is also said that any idea that it would be continued was given up by all parties in interest before February, 1908, and as the two remaining items allowed against the Metropolitan estate under this head one of $7,535.59 for the special franchise tax and the other of $2,-769.13 balance of real estate tax, both accrued on October 7, 1907, and as counsel for the City receiver and for the Pennsylvania Steel Company insist that the lease must be regarded as having terminated prior to that date and not later than October 1, 1907, the question is squarely presented by the record now before the court as to whether it did so terminate. The record in this proceeding, unlike that in the Central Crosstown case, by express stipulation contains the record in the "Termination of Lease" proceeding so called, and, unlike that case, it suggests this question as to the date when the lease terminated as distinguished from having been defaulted on, which was there neither suggested nor considered. What was said by the Circuit Court of Appeals in the Termination of Lease proceeding was that this question of termination involves an inquiry as to the right and fact of re-entry and should be passed upon only when necessary to a real controversy, which, it was said, was a question outside any substantial controversy prevented upon that appeal. Here the controversy is squarely presented, and I think that on the facts it must be held that the right to re-entry existed on the 25th of September, 1907, when receivers of the City Company were appointed (Quincy, etc., R. Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787, 36 L. Ed. 632), and that it was in fact exercised when receivers were appointed of the Metropolitan estate on October 1st following. The financial history of the five years preceding the receivership disclosed by the present record made it clear at this date that it would be quite impossible to meet the fixed obligations accruing under the City lease in the nature of interest and taxes, to say nothing of the payment of the dividend rental reserved to Metropolitan stockholders, the continuation of which was involved in the adoption of the lease, so that neither at that time nor since did any of the parties in interest, or the court itself, as its later orders and opinions show, have any idea of electing to adopt it for the benefit of the City estate. As the Circuit Court

of Appeals evidently regards the question as to the date of the actual termination of the lease prior to February 1, 1908, as still open, I shall report October 1, 1907, as such date, and shall, accordingly, recommend the disallowance as against the City estate of these two items of taxes accruing October 7, 1907.

The remaining item allowed against the Metropolitan estate is for real estate taxes and assessments and franchise taxes. Of these taxes it is clear that no allowance can be made of items accruing prior to the inception of the lease to the City Company, for in my judgment no such taxes were assumed. The lease distinctly provides for apportionment of charges then due, which is wholly inconsistent with any intention to assume such payment. So, with reference to the franchise tax for the year 1907, that may not be allowed, if I am right in thinking that the lease terminated on October 1, 1907, for it did not accrue until October 7th following, and the rule is inflexible that charges accruing under a lease after its termination are not allowable against the estate of an insolvent lessee. American Bonding Co. v. Pueblo Ins. Co., 150 Fed. 17, 80 C. C. A. 97, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357. The only taxes that may be considered in this connection are the franchise taxes accruing from 1902 to 1906, inclusive, the principal sum being $225,873.99, and the interest to October 1, 1907, $50,617.65, a total of $276,491.64. They are in the nature of a rental charge such as comes within the assumption clause contained in the Metropolitan-City lease as construed by the Appellate Court in its recent decision cited and were allowed in the Central Crosstown case as against the City estate. Counsel for the Pennsylvania Steel Company and the City receiver have in their briefs advanced arguments of such persuasive force in support of their contention that the covenants of the City Company in the lease to it were intended solely for the benefit of the Metropolitan Company and that it alone should have the right to sue, leaving the original lessors to their remedy against that company, which through its receiver is now actually asserting its claims against the City estate for damages for similar identical breaches of these same covenants, that I should not hesitate to adopt their view and disallow this item altogether if I thought the question could be regarded as an open one. There are strong intimations that this is the correct view in the opinion of Judge Noyes in the Second Avenue bondholders' appeal, where it is intimated that the law of the federal forum and that of the New York courts are not now far apart, and that the rule that a contract upon which a third party may sue must have the benefit of that party as its object which the court evidently did not feel was at all clear on the face of the lease. Claimants urge, however, the Central Crosstown case in which the allowance was made against the City estate of franchise taxes accruing during the existence of the City lease, and I shall follow it in recommending the allowance of the taxes above mentioned from 1902 to 1906, inclusive, amounting to $276,491.64.

Proposed reports in accordance with the foregoing should be filed with me and served on respondents on or before May 8, 1913, and proposed amendments and objections thereto five days later.

J. Parker Kirlin, of New York City, for Metropolitan St. Ry. Co.

James L. Quackenbush, of New York City (Jas. T. Mason, of New York City, of counsel), for New York City Ry. Co.

Dexter, Osborn & Fleming, of New York City (M. C. Fleming, of New York City, of counsel), for receiver of New York City Ry. Co.

Byrne & Cutcheon, of New York City (Chas. M. Travis, of New York City, of counsel), for Pennsylvania Steel Co. and Degnon Contracting Co.

Davies, Auerbach & Cornell, of New York City (B. Tolles of New York City, of counsel), for Guaranty Trust Co. of New York, Second Ave. R. Co., and Lynch, as receiver.

Chas. T. Payne and Geller, Rolston & Horan, all of New York City, for Farmers' Loan & Trust Co.

Geo. N. Hamlin and O'Brien, Boardman & Platt, all of New York City, for committee of contract creditors of New York City Ry. Co.

Charles Benner, of New York City, for committee of tort creditors of New York City Ry. Co.

Simpson, Thacher & Bartlett, of New York City, for committee under Metropolitan St. Ry. Co. stockholders' protective agreement.

Strong & Mellen, of New York City (Mr. Chase, of counsel), for Central Park, N. & E. R. R. Co.

Chas. H. Tuttle, of New York City, for Cornell and Belt Line Ry. Corp.

Richard Reid Rogers, of New York City (Jas. T. Mason, of New York City, of counsel), for Central Crosstown R. Co. and New York Rys. Co.

L. C. Krauthoff and J. P. Cotton, Jr., both of New York City, for committee acting under a plan of reorganization of Metropolitan St. Ry. Co.

Masten & Nichols, of New York City (Arthur H. Masten, of New York City, of counsel), for receiver of Metropolitan St. Ry. Co.

Page, Crawford & Tuska, of New York City (Wm. H. Page and Gilbert H. Crawford, both of New York City, of counsel), for Metropolitan Express Co.

LACOMBE, Circuit Judge. No attempt will be made to restate the extremely complicated series of questions which have been presented in this proceeding. Such of the special master's conclusions as have been controverted on the argument will be taken up in convenient, although perhaps not in logical sequence.

## Claim Against Metropolitan.

1. It is contended that the amount of damages allowed for failure to keep rolling stock, other than the motors and electric equipment in good working order ($81,647.94), should be materially increased. There was a wide discrepancy between the experts as to the cost on November 18, 1908, of thus repairing the closed cars then turned over to claimant. This discrepancy is due in part to different assumptions by the experts as to the condition in which the cars then were. The testimony of the witnesses has been read and I see no reason to find that there was any material difference in condition between these cars thus turned over and the general run of cars of the same age in use in the system, and concur with the master's finding that the estimate of the man who had some real knowledge of their condition at that time is the more satisfactory.

2. As to the refusal to allow damages for the loss of the car barn by fire on February 29, 1908, the master's conclusion that under prior decisions of the Circuit Court of Appeals in these proceedings show such allowance cannot be made is concurred in.

[1] 3. As to the premiums on bonds received by the Metropolitan at par and sold for a higher price, I am clearly of the opinion that under the lease there were specifically provided alternative ways for repaying the Metropolitan for moneys laid out under the clause in question. The lessor might itself sell (or cause to be sold) the bonds and turn over the proceeds, or it might make payment in bonds at their face value. Sometimes one method was followed, sometimes the other, and there seems to be no sound reason for insisting at this late day that the accounting between the parties shall be recast so as to eliminate the alternative method which the contract expressly provided for. If there be any evidence in the record as to the value of these bonds, it has not been found, but presumably the circumstance that they were salable at a premium was due to the circumstance that the lessee guaranteed their payment.

[2] 4. As to the item of interest on moneys advanced by lessee during the period of reconstruction, the argument of claimants is unpersuasive; such interest is usually allowed and nothing is found in the lease, in the record or in authority that requires a different ruling in this case. The master's disposition of this item is affirmed.

5. I think also that the lessee company upon its accounting for these expenditures properly credited itself with accrued interest on bonds sold, because under other clauses in the lease it was obligated to pay the same interest to the holder of each bond on its next coupon date. There are two such items of credit allowed by the master $37,970.29 and $13,185, totalling $51,155.29. Claimant's brief asserts that the total actual amount of such accrued interest was only $23,850. This court cannot search the record to verify the fact, but if it be a fact the master's allowance of credits for accrued interest should be reduced to the true amount.

6. As to the item of $6,410.39 construction charges the master's findings and conclusions are confirmed.

7. The next item is $750,000 (power house contract) credited to Metropolitan against debits for bonds turned over for expenditures in change of motive power and reconstruction. In his first opinion the master thought it unnecessary to pass upon this item. It was used only as a set off or credit against the amount of debits charged against the Metropolitan on bond account. Inasmuch, however, as he found for respondent as to items 3 and 4, supra, there was no excess of debits over other proved credits which made it necessary to consider this set-off. In a supplementary report he did dispose of it; why is not entirely clear, as he did not change his conclusions as to items 3 and 4.

It seems clear enough that under the lease, which expressly provided for change of motive power, the building of a power house was a legitimate part of such change. Instead of building one, a contract was made between the two roads by which in consideration of $750,000 in bonds the Metropolitan agreed not only to furnish power for Second Avenue system from its own power house while the lease lasted, to run the road, which it would have to do anyhow, but also in case the lease should terminate, and the Second Avenue Company resume possession or the mortgage should be foreclosed, to continue to furnish power for the system for the unexpired term of the charter of the Second Avenue Company and any renewals thereof. This contract must be tested by conditions existing when it was made, when every one expected the Metropolitan would continue a solvent concern. I agree with the special master that the contract cannot be held fraudulent and void in its inception. If the price was exorbitant equity might scale it down, but if the master's conclusions were erroneous as to items 3, 4, and 5, the balance against Metropolitan on the bond account would be but $114,930.56 and the power house contract at the time it was made must certainly have been worth that amount.

[3] 8. As to the interest on the cash, practically operating capital, turned over with the road, cars and other personal property under the lease, the clause, which provides that in the event of default and resumption of possession by lessor it shall be deemed to be a loan and shall be returned, does not call for the payment of interest thereon. There was no wrongful withholding of this money during the lease. Moreover, the lease itself expressly states that, like the other personal property it is received by the Metropolitan "as lessee thereof," language which seems clearly to import that the consideration for its use, like the consideration for the use of the other personal property, is included in the rent stipulated in the lease.

[4] 9. The remaining matter in controversy is the allowance by the master as a set-off of $740,836.41 for expenditures in connection with the electrification of the First Avenue line. When the lease was made certain changes and improvements in the way of electrification of parts of the railroad which had been approved by the State Board of Railroad Commissioners were under way. These, as we have seen, were to be paid for by the issue of bonds se-

cured by a mortgage already executed to the Guaranty Trust Company. There was, of course, the possibility that in the future the Metropolitan might find it desirable to electrify other parts of the road either to improve the operation of the Second Avenue lines or of other parts of the Metropolitan system of which those parts were connecting links. If it should make expenditures for these purposes without any provision as to payment therefor, and the lease should subsequently be abrogated and the property be retaken by the Second Avenue Company or its mortgagee, these expenditures, although greatly benefiting the property, would be lost to the Metropolitan, being irremovable additions to leased property placed there by a lessee. In order to meet such a contingency, therefore, the lease expressly provided that such expenditures should be paid for by the Second Avenue with additional bonds to be secured by the making of a new mortgage inferior in lien to the existing mortgage. The clause is quoted in the master's opinion. The contention that the general provision "this lease is made subject to all debts and liabilities of the party of the first part * * * and such debts * * * are hereby assumed and are to be paid by the party of the second part," covers these future inferior mortgage bonds is unpersuasive, especially as the parties evidently considered mortgage bonds a sort of liability which called for express provision, since in the same sentence they specifically provided for the Guaranty Trust mortgage bonds.

The exceptions to the report on the claim against Metropolitan Company are overruled and the report confirmed—except possibly as to the $23,850, accrued interest referred to above.

### Claim Against City Railway.

Substantially all the propositions involved in the disposition of this claim depend upon the scope and meaning of various prior deliverances of the Court of Appeals in opinions filed upon the decision of appeals taken in other proceedings involved in this receivership. That tribunal would be in no way assisted towards the disposition of the appeal in this proceeding by a statement of the interpretation of those deliverances which seems to this court to be the correct one or of the reasons which lead to such a conclusion. It knows better than the special master or the District Court precisely what legal propositions are contained in those opinions. It is enough to say that, generally, the views of the special master are concurred in.

The exceptions are overruled and the report confirmed.